UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

A.D and H.D., on behalf of J.D.,

Plaintiffs,

v.

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

--------------------------------------X

06 Civ. 8306 (BSJ)

**Order**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs, A.D. and H.D. ("Plaintiffs" or "J.D.'s parents"), on behalf of their minor child, J.D., bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401 *et seq.*, against Defendant, New York City Department of Education ("DOE"). Plaintiffs seek review of an administrative decision, affirmed by the State Review Officer ("SRO") at the New York State Education Department's Office of State Review, which reduced funding for previously ordered Applied Behavior Analysis ("ABA") services and which refused to award funding for meetings attended by J.D.'s ABA service providers ("team meetings"). Plaintiffs now move for summary judgment and seek an order reversing the administrative decisions and directing reimbursement and funding for additional hours of ABA services as well as the team meetings which J.D.'s parents unilaterally provided. Defendants

cross move for summary judgment, seeking an order upholding the administrative decisions and dismissing Plaintiffs' complaint. For the reasons set forth below, the Court denies Plaintiffs' motion for summary judgment and grants DOE's motion for summary judgment dismissing Plaintiffs' complaint.

**FACTS AND PROCEDURAL HISTORY**

The administrative record reveals the following factual background. J.D., who was born in January 2000, received a "tentative diagnosis" of autism when he was 19 months old. (IHO Tr. at 171). The family moved to New York City in October of 2004 and J.D was enrolled in a general education private pre-school. A referral was made to DOE's Committee on Preschool Special Education ("CPSE") in November of 2004 and J.D. was evaluated at the McCarton Center for Developmental Pediatrics. Additional evaluations were also conducted including, a speech and language evaluation, occupational evaluation, classroom observation and psycho-educational update.

In January of 2005, CPSE met and recommended that J.D. be classified as a child with disability and receive a 12 month program of 25 hours per week of special education iterant teacher ("SEIT") services, as well as the related services of speech language therapy and Occupation Therapy ("OT"). (Ex. HH). These recommendations were contained in an Individualized Education Plan ("IEP") dated January 13, 2005. (Ex. D). J.D.'s

parents challenged the January 13, 2005 IEP as providing insufficient ABA hours. (Ex. C at 7). In a decision dated September 21, 2005, IHO Robert Briglio ordered DOE to reimburse J.D.'s parents for the costs of ABA/SEIT services received from private therapists and a supervisor for 25 hours per week until the end of the period covered by J.D.'s January 13, 2005 IEP which ended on January 12, 2006. Neither side appealed the decision.

During the 2005-2006 school year, J.D. was placed in a kindergarten class for talented and gifted ("TAG") students at P.S.11, a public school in Manhattan operated by the DOE. This was a general (i.e. non-special) education class. The TAG program is composed of children who function at a "higher level" than children in a regular kindergarten class.

During the summer of 2005, CPSE had convened three times to develop a new IEP for J.D. The resultant IEP dated August 4, 2005 recommended placement in a general education class, with two hours per day of direct in-class SEIT services and two periods per month of indirect SEIT services. Five hours per week of counseling, OT and speech related therapy was also recommended. In January of 2006, J.D.'s parents challenged the new IEP, asserting, *inter alia*, that it was procedurally defective in that neither J.D's parents nor a general education teacher participated in preparing it. J.D.'s parents also

challenged the new IEP on substantive grounds, claiming that the goals and objectives contained therein were vague and insufficiently defined and that the recommended program contained insufficient ABA services.

An impartial hearing commenced before IHO Morton A. Cohen on March 1, 2006. At the impartial hearing, the parties stipulated that the IEP dated August 4, 2005 was null and void.[1] J.D.'s parents adopted the position that 25 hours per week of ABA services and 12 hours per month of team meeting time were needed to meet J.D.'s special education needs and they sought reimbursement for this amount of services and meeting time from January 13, 2006 forward. In other words, J.D.'s parents sought to maintain reimbursement for the 25 weekly ABA hours ordered by IHO Briglio in the September 21, 2005 decision and to add reimbursement for 12 hours per month of ABA team meetings.[2] DOE asserted that the additional 12 hours requested should be denied and that the 25 hours per week of ABA services which J.D. was currently receiving should be reduced.

The impartial hearing proceeded before IHO Cohen and testimony was taken on three days in March and April 2006. Sara Kahn, the ABA supervisor for J.D., Jennifer Wills, a confederate

[1] The record does not disclose the reason for the parties' stipulation that the IEP was null and void. (*See* Tr. 1 at 9). It is clear that the failure to include a child's parents and general education teacher in the preparation of the child's IEP would violate the IDEA. *See* 20 U.S.C. § 1414(d)(4)(A)(i).

[2] This request for reimbursement for team meeting time had previously been rejected by IHO Briglio in the September 21, 2005 decision.

aide[3] to J.D. and H.D. were Plaintiffs' primary witnesses.[4] Kahn testified that J.D. had been making considerable progress and that the goal was to gradually fade out the ABA services so that J.D. would be without support by June of 2007. (Tr. 1 at 42-43). Kahn testified that J.D. had progressed through discreet trial teaching (the standard way that children with autism are typically taught in behavior analysis programs) and was now learning primarily through the less repetitive and systematic methods of incidental and natural environment teaching. (Tr. 1 at 28-29). Kahn testified that J.D.'s bad behaviors were improving and none were getting worse.[5] (Tr. 1 at 74). However, Kahn also testified that she believed that if J.D.'s support services were reduced "he would slowly begin to fall through the cracks at school." (Tr. 1 at 56). Kahn testified that J.D. continued to struggle to learn incidentally in the classroom and needed to be pre-taught academic skills in advance of his class. (Tr. 1 at 56-57). Kahn also testified that the presence of Wills, the confederate aide in the classroom, was necessary in order to target areas which required improvement.

---

[3] A confederate aide is one who is present in the classroom to support a disabled child without that child or the other children knowing that the aide is there solely on the disabled child's behalf. The purpose of the confederate approach is to provide support to a disabled student while avoiding the stigma and the feelings of low self-esteem which might result if it was clear that the student had a dedicated aide in the classroom.

[4] J.D.'s mother also testified on behalf of Plaintiffs.

[5] J.D.'s past behavioral problems included toileting accidents and lying. (Tr. Further, the ABA team found that in the past J.D. was at times non-responsive. (Tr. at 66-69).

Wills testified that as a confederate aide, she served as an observer and aide to J.D. without J.D. or the other children in the class knowing that she was there for his sole benefit. (Tr. 1 at 118). Wills identified several areas in which J.D. needs improvement. For instance, Wills testified that J.D. was prone to imitate the inappropriate behavior of other children and that there had been recent "butt-slapping" incidents. (Tr.1 at 126). Both Wills and Kahn testified that J.D. had trouble following multi-step directions and was reluctant to raise his hand in class even when they believed he knew the answer. (Tr.1 at 69-72, 143-145). Wills and Kahn also testified that J.D. engaged in bad behaviors at home and both expressed concern that those behaviors might spill over into the classroom without proper support.

DOE's witnesses were Ms. Koukiotis, J.D.'s kindergarten teacher and Ms. Leonhardt, a P.S. 11 guidance counselor. Koukiotis testified that academically, J.D. fell "squarely in the middle" of his TAG class and that with respect to his social interactions, J.D. did not require more intervention that 60 percent of the other students in her class. (Tr. 2 at 185-186). Koukiotis testified that J.D's cited behavior was that of a typical child. Leonhardt, who has extensive special education teaching expertise, met J.D. at a DOE summer program in 2005, provided counseling to him in the fall of 2005 and observed him

twice in class. (Tr. 2 at 15). Leonhardt testified that based on her observations, J.D.'s behavior was that of a typical child his age. (Tr. 2 at 26). Leonhardt further testified that in her opinion J.D. did not need SEIT or ABA services. (Tr. 2 at 40).

IHO Cohen rendered his decision on May 4, 2006, holding that a reduction in the level of ABA services that J.D. was receiving was warranted and granting reimbursement for 10 hours per week of ABA services and 5 hours per month of supervisory ABA services. IHO Cohen found that the level of services for which Plaintiffs were seeking reimbursement was "entirely inappropriate." (IHO Decision p. 16). IHO Cohen found that the level of ABA services being provided was excessive, noting that J.D. had no time for a snack after school and that even his play dates included an ABA therapist who recorded everything. (IHO Decision at 13). IHO Cohen also found that the pre-teaching services were potentially harmful because the subject matter was inappropriately difficult, even for an academically gifted child such as J.D. (IHO Decision at 14-15). IHO Cohen also found that some of the services for which reimbursement was sought were improper in that they were not special education support services at all, but simply child care. Specifically, IHO Cohen found that when ABA therapists took J.D. to the playground for improvised, unstructured play time which was not part of Kahn's

program, this was analogous to providing child care services. (IHO Decision at 13).

IHO Cohen was "not impressed by the testimony" of Kahn and Wills "regarding J.D.'s needs." (IHO Decision at 11). IHO Cohen concluded that the ABA therapists and supervisors were not responsible for J.D.'s school success and that the support they provided was incidental at best. (IHO Decision at 12). Noting that Wills spends little time in the classroom, IHO Cohen found that "her presence is not a factor in [J.D.'s] appropriate behavior for the kindergarten year." (IHO Decision at 12). Rather, IHO Cohen attributed much of J.D.'s progress to his general education teacher, Koukiotis.

IHO Cohen also found that J.D.'s behavioral problems both at home and in the classroom had been exaggerated. While Wills testified that J.D.'s behavior was extreme, IHO Cohen noted that he was not persuaded that Wills was familiar with "what is considered typical behavior of a kindergarten child." IHO Cohen did credit Koukiotis's and Leonhardt's opinions that J.D.'s behavior is that of a typical child. (IHO Decision at 11). IHO Cohen also noted that the ABA team, which monitored and memorialized J.D.'s actions frequently, did not keep any record of J.D.'s aggressive home behaviors or tantrums. Further, IHO Cohen also found it curious that J.D. behaved appropriately when in school where he receives no direct support and displayed

serious behavioral issues at home where he receives extensive direct support. (IHO Decision at 12).

J.D.'s parents appealed the IHO decision to the SRO, alleging that the IHO had incorrectly required that the parents prove that the services for which they sought reimbursement were "necessary" rather than "appropriate." In an opinion dated September 20, 2006, the SRO affirmed IHO Cohen's decision. The SRO found that IHO Cohen had recited the proper burden of persuasion and that it was clear from the IHO decision read as a whole that IHO Cohen had applied the proper standard. (SRO Decision at 7). The SRO agreed that J.D.'s parents had failed to prove that the ABA services were appropriate to meet J.D.'s special education needs and concluded that the IHO's decision was "well reasoned and thorough and I see no need to modify his order." (SRO Decision at 6).

Plaintiffs filed their complaint with this Court on October 11, 2006, challenging the decision. Plaintiffs ask this Court to (1) reverse the May 24, 2006 amended findings of fact and decision by IHO Cohen and the SRO decision dated September 20, 2006, (2) grant reimbursement for the services which Plaintiffs unilaterally provided, (3)enforce and order DOE to recognize J.D.'s statutory and automatic pendency entitlements, and (4) determine that Plaintiffs are the prevailing party in this matter and in the underlying administrative proceedings and

grant Plaintiffs leave to file an application for statutory attorney's fees.

## DISCUSSION

### I. The IDEA

Congress enacted the IDEA to promote the education of children with disabilities." *See, e.g., Board of Educ. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Under the statute, states receiving federal funding must provide disabled children with a "free appropriate public education." (20 U.S.C. § 1412(1). This "free appropriate public education" ("FAPE") must include "special education and related services" tailored to meet the unique needs of the particular child, *id*. § 1401(a)(18), and be "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207.

"The 'centerpiece of the statute's education delivery system' is the IEP, an educational program tailored to provide appropriate educational benefits to individual disabled students." *Viola v. Arlington Central School Dist.*, 414 F.Supp.2d 366, 377 (S.D.N.Y. 2006)(quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IDEA requires that a written IEP be formulated on an annual basis, developed by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak v. Florida*

*Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citing 20 U.S.C. § 1401(a)(20)). While IEPs are subject to numerous procedural and substantive requirements, "the IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." *Walczak*, 142 F.3d at 130. However, the case law makes clear that school districts are not required to "furnish ...every special service necessary to maximize each handicapped child's potential." *Rowley*, 458 U.S. at 199. "Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 195 (2d Cir. 2005)(quoting *Walczak,* 142 F.3d at 130). The IDEA "further imposes on school districts developing IEPs a strong preference for 'mainstreaming,' or educating children with disabilities 'to the maximum extent appropriate' alongside their non-disabled peers.'" *Grim*, 346 F.3d at 379 (quoting 20 U.S.C. § 1412(a)(5). In other words, the "special education and related services must be provided in the least restrictive setting consistent with a child's needs." *Walczak*, 142 F.3d at 122.

New York has established regulations implementing the goals of the IDEA, which "appear to track the IDEA closely." *Board of*

*Educ. v. O'Shea*, 353 F.Supp.2d 449, 454(S.D.N.Y. 2005); *see* N.Y. Educ. Law § 4401 *et seq*. Under New York law, parents who are dissatisfied with a proposed IEP may request, pursuant to IDEA-mandated procedures, an impartial hearing to be held before a hearing officer. *See* N.Y. Educ. Law § 4404(1). Following the decision from that hearing, an aggrieved party may appeal to a State Review Officer, whose decision is final and concludes the administrative process. *See* N.Y. Educ. Law § 4404(2). Once this two-step administrative process is exhausted, a dissatisfied party may bring a civil action challenging the decision in federal or state court. *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

**II. Federal Judicial Review under the IDEA**

IDEA actions in federal court are frequently resolved on summary judgment motions. *Antonacchio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F.Supp.2d 710, 714 (S.D.N.Y. 2004). An IDEA action, however, differs from an ordinary summary judgment motion in that the existence of a disputed issue of fact will not defeat the motion. *Id*. Rather, in a review action pursuant to 20 U.S.C. § 1415(i) of the IDEA, the district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence

at the request of a party[6]; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.A. § 1415; *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).

"The standard by which a district court reviews the final determination of the State Review Officer has been characterized as 'modified *de novo* review.'" *C.B. v. New York City Dept. of Educ.*, No. 02 Civ. 4620, 2005 WL 1388964 *12 (E.D.N.Y. 2005). Although the district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, both the Supreme Court and the Second Circuit have interpreted the IDEA as strictly limiting judicial review of state administrative decisions. *See Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v.* Rowley, 458

[6] Plaintiffs have requested that in connection with pending motions for summary judgment, this Court consider two pieces of evidence which were not part of the administrative record as "additional evidence" pursuant to 1415(i)(2)(C) of the IDEA: (1) an August 8, 2007 decision of Hearing Officer Susan Lushing ("2007 decision") and (2) a Wall Street Journal article which Plaintiffs contend exposes evidence of bias and related problems in the office of the State Review Officer. Defendant opposes this request on the grounds that this application is not in conformity with Rule 56 of the Federal Rules of Civil procedure, that the documents are not relevant or admissible, and also do not meet the additional requirements of 20 USC § 1415(i)(2) of the IDEIA. The Court has considered the additional evidence submitted by Plaintiffs. However, the 2007 decision is irrelevant and the article is inadmissible. The 2007 decision concerns a different impartial hearing complaint, a different school year and a different education program. Accordingly, the 2007 decision is not relevant to this pending action. The Wall Street Journal article contains complaints, allegations and conclusory opinions about the State Review Officer in this case. These are clearly out of court statements and Plaintiffs offer them as proof of the truth of the matters asserted therein. Thus, the article is inadmissible under FRE 802.

U.S. 176, 206 (1982); *Walczak*, 142 F.3d at 129. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally lack[s] the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206, 208).

**III. Reimbursement under the IDEA**

Where, as here, the Court is presented with the question of reimbursement for services unilaterally provided by a parent, the governing standards are clear. A Board of Education may be required to reimburse parents of a child with a disability for unilaterally provided educational services if (1) the services offered by the district were inappropriate; (2) the services provided by the parents were appropriate under the IDEA; and (3) equitable considerations support the parents claim. *See School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, (1985); *see also Florence County Sch. Dist. Four v. Carter*, 510 u.s. 7 (1993). The party seeking relief bears the burden of satisfying each of the *Burlington/Carter* factors. *See Schaffer v. Weast*, 546 U.S. 49 (2005).

In the present case, the first prong of the Burlington/Carter analysis was satisfied when the DOE conceded that the relevant IEP was null and void, precluding a finding

that the school district provided J.D. with a FAPE. Additionally, the DOE conceded that no equitable considerations precluded Plaintiffs' claim. These are not issues on appeal.

Therefore, whether Plaintiffs satisfied the second prong of the Burlington/Carter analysis is the sole focus of this appeal. Once it is established that a school district's IEP is inappropriate, a court must then consider whether "the private education services obtained by the parents were appropriate to the child's needs." *Walczak,* 142 F.3d at 129. As noted, parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate. *See M.S.*, 231 F.3d at 104. Nevertheless, "the standard applied to determine the appropriateness of parental placement is less restrictive and subject to fewer constraints than that applied to the school authorities." *C.B. v. New York City Dept. of Educ.*, No. 02 Civ. 4620, 2005 WL 1388964 *53 (E.D.N.Y. 2005). For instance, "an appropriate private placement need not meet state education standards or requirements." Additionally, parents "may not be subject to the same mainstreaming requirements as a school board." *Frank G. v. Bd. of Educ.,* 459 F.3d 356, 364 (2d Cir. 2006). Nonetheless, IDEA's requirement that an appropriate education be in the mainstream to the extent possible, *see* 20 U.S.C. § 1412(5)(B) (1994), remains a consideration that bears upon a parent's

choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate, as it was here.

Subject to those limited exceptions, “the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement.” *Frank G.*, 459 F.3d at 364. “Ultimately, the issue turns on whether a placement-public or private-is “reasonably calculated to enable the child to receive educational benefits.” Id. (quoting *Rowley,* 458 U.S. at 207).

**ANALYSIS**

Plaintiffs maintain that that they met their burden of proving that the ABA services for which they seek reimbursement are appropriate to meet J.D.’s special education needs. Plaintiffs contend that cuts imposed by IHO Cohen were arbitrary and that both he and the SRO erred by placing too a high a burden of persuasion on them, requiring them to demonstrate that the level of services for which they sought reimbursement was “necessary” instead of “appropriate.” (*See* Pls.’ Mem. at 7). Defendants assert that the IHO and SRO applied the correct burden of persuasion and maintain that Plaintiffs failed to prove that the ABA services for which they sought reimbursement

were appropriate to meet J.D.'s special education needs in the least restrictive environment.

The Court finds that both the IHO and the SRO applied the proper burden of persuasion. Plaintiffs made this same argument on appeal to the SRO, concerning the IHO's determination. The SRO considered and rejected this argument, finding that the proper standard was whether the level of services was appropriate and that this was the standard that the IHO used. (SRO Decision at 7). The Court agrees. IHO Cohen recited the correct standard and found that the level of ABA services for which Plaintiffs sought reimbursement was inappropriate. (IHO Decision at 10). The SRO reviewed the record and also found that the intensive level of ABA services for which reimbursement was sought was excessive and did not appropriately address J.D.'s special education needs. Both the IHO and SRO found that the some of these ABA services were addressing home behaviors and were aimed at inappropriately pre-teaching J.D. beyond even the level of the TAG kindergarten classroom. Both the IHO and the SRO found that some of this pre-taught material was too advanced for even a high functioning child such as J.D. and that pre-teaching to this extent could be frustrating for a child of J.D.'s age. Further, both the IHO and the SRO found that the level of ABA services which Plaintiffs were providing was

depriving J.D. of his independence, privacy, and recreational time. (IHO Decision at 13; SRO Decision at 7).

Plaintiffs' also argue that the IHO and the SRO improperly "recognized a need to intervene with J.D.'s interfering behaviors only if the behavior was 'aggressive' or 'extreme.'" (Pls. Mem. at 7). However, if Plaintiffs' argument were correct then the IHO and the SRO would have authorized no services since both found that J.D.'s behavior and social skills were appropriate and typical for a child of his age. Instead, both the IHO and the SRO authorized 45 hours per month of ABA services.

The Court finds that there is ample evidence in the record to support the administrative determination that Plaintiffs failed to prove that the level of ABA services for which they are seeking reimbursement is appropriate to meet J.D.'s special education needs. J.D. leaves for school at 8:15 a.m. and his school day ends at 3:00 p.m. In an average week, he receives ABA therapy for three hours after school from 3:30 p.m. to 6:30 p.m., four days a week. One day per week, he receives three hours of speech-language therapy from 4:00-7:00 p.m. If J.D. missed a weekday ABA session, it would be made up over the weekend. These weekend sessions sometimes incorporated play dates that included academic activities. Considering, J.D.'s demonstrated superior academic skills and appropriate classroom

behavior, this intensive level of ABA services is not appropriate.

This conclusion is also supported by evidence that the pre-teaching which the ABA team engaged in might be harmful to J.D.'s educational progress. The ABA clinic notes indicated that J.D. was non-responsive when the team pre-taught the difficult material. (Ex. T). Koukiotis testified that it was appropriate to work on things a child cannot do only if the focus was on developmentally appropriate skills; otherwise it could frustrate a child and negatively affect his self-esteem. (Tr. 2 at 269-270). The record also supports the conclusion that J.D.'s behavioral deficits are limited to the home and that these deficits do not interfere with his educational progress. Thus, ABA services aimed at correcting these home behaviors cannot be said to be "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207.

Plaintiffs argue that the record does not support the determination made by both the IHO and the SRO that much of J.D.'s progress can be attributed to his general education teacher, Koukiotis. Rather, Plaintiffs argue that the fact that Koukiotis did not see or review the IEP until the impartial hearing directs a finding that the ABA team is solely responsible for J.D.'s educational, social and behavioral gains in the classroom. The Court rejects this contention. First, this

argument is unavailing because the significance that Plaintiffs place on this IEP is not supported by the record. The parties stipulated at the hearing that the IEP was null and void. Further, Kahn, the Plaintiffs' primary witness and the ABA supervisor testified on two different dates and did not once mention the IEP. Second, the record as a whole does not provide a basis for concluding that the ABA therapists are responsible for all of J.D.'s progress. Koukiotis has extensive experience in early childhood education and was with J.D. for over 30 hours per week in his full day kindergarten class. Koukiotis testified that she was able to select behaviors that J.D. needed to work on just as she was able to do with other children in her class and that she was able to effectively teach J.D. and assist him in following directions, routines, and tasks. Further, Koukiotis worked on improving some behaviors such as eye contact which the ABA therapists also worked on. Lastly, Plaintiffs' own witnesses acknowledged Koukiotis to be an excellent teacher and a valuable resource to the ABA team. Kahn testified that the ABA team had implemented recommendations made by Koukiotis and that Koukiotis had made the ABA providers aware of issues that the ABA team "didn't even realize were issues." (IHO Tr. 1 at 45-47).

Likewise, the record supports the finding that the support offered by Kahn and Wills was not responsible for J.D.'s

classroom success and that J.D. functioned well at school without direct support. Kahn visited J.D's class only two to three times per year. Wills testified that her role in the classroom was to facilitate prompting of the child and to provide information regarding the child's home program to his teacher. (Tr. 1 at 118). However, Wills also testified that she often did not directly interact with J.D. and Koukiotis testified that the presence of Wills did not have a noticeable impact on J.D.'s behavior in the classroom. (Tr. 2 at 182).

Plaintiffs argue that the IHO and SRO did not understand the value of confederate therapy. Kahn testified that a large part of what a confederate therapist did was prompt the teacher to assist the child (Tr. 1 at 91-92). Yet Koukiotis testified that she had met with Wills only five or six times since the beginning of the school year. (Tr.2 at 176-177). Wills testified that as a confederate aide her main goal was to report back to the home team what was happening in the classroom. However, she also admitted that she was not qualified to assess the behavior of typically developing children and, therefore, could not assess whether J.D.'s behavior was appropriate for his age. (Tr. 1 at 156-57).

Finally, the Court finds that by providing the services ordered by the IHO and the SRO, DOE will fulfill its responsibility under the IDEA to provide a FAPE. When assessing

a proposed educational program, the Second Circuit instructs that a "federal court must examine the record for any 'objective evidence' that the child is likely to make progress or regress under the proposed plan." *Cabouli v. Chappaqua Cent. Sch. Dist.*, 202 Fed. Appx. 519, 521 (2d Cir. 2006). Here, the administrative decisions below awarded 10 hours weekly of ABA therapy plus five hours monthly of ABA supervision. There is ample evidence on the record that J.D. would continue to make educational progress without 10 hours weekly of confederate therapy and without 5 hours per week pre-teaching at home. J.D.'s above-grade level academic performance is objective evidence that J.D. does not need to be pre-taught academic material at home. J.D's appropriate and consistent behavior in the classroom provides evidence that he would continue to make educational progress without a confederate aide in the classroom.

## **PLAINTIFFS' PENDENCY ENTITLEMENT**

The IDEA's pendency or "stay-put" provision states: "during the pendency of any proceeding (relating to the identification, evaluation or placement of a child with a disability), unless the State or local education agency and the parents otherwise agree, the child shall remain in the then current educational placement of such child until all proceedings have been completed." 20 U.S.C. § 1415(j); *see also* N.Y. Educ. § 4404(4).

Plaintiffs seek pendency as conferred By IHO Briglio's decision which required reimbursement for 25 hours of ABA services per week.[6] The decision of an IHO that becomes final and non-appealable because it is not appealed constitutes a child's pendency entitlement. Accordingly, Plaintiffs should be reimbursed in accordance with IHO Briglio's decision until the entry of this order.

## CONCLUSION

For the aforementioned reasons, the Court denies Plaintiffs' motion for summary judgment and grants DOE's motion for summary judgment dismissing Plaintiffs' complaint.

**SO ORDERED:**

Barbara S. Jones

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated: New York, New York
April 21, 2008

[6] IHO Briglio allowed some of the 25 hours per week to be billed at the higher hourly supervisory rate. Briglio limited reimbursement at this rate to 12 hours per month.